**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
-----------------------------------------------------------------------X
CHARLOTTE NEWMAN,                                        :
                                                        :
                                   Plaintiff,           :        Case No.: 21-cv-00531 (DLF)
                                                        :
            v.                                          :
                                                        :        **AMENDED COMPLAINT**
AMAZON.COM, INC., AMAZON WEB                             :
SERVICES, INC., ANDRES MAZ, STEVEN                       :
BLOCK, and SHANNON KELLOGG, in their                    :        **DEMAND FOR JURY TRIAL**
individual and professional capacities,                 :
                                                        :
                                   Defendants.          :
-----------------------------------------------------------------------X

     Plaintiff Charlotte Newman ("Plaintiff" or "Ms. Newman"), by and through her

undersigned counsel, Wigdor LLP, as and for the Complaint in this action against Defendants

Amazon.com, Inc., Amazon Web Services, Inc. ("AWS") (together, "Amazon" or the

"Company"), Andres Maz, Steve Block, and Shannon Kellogg, in their individual and

professional capacities, (collectively, "Defendants") hereby states and alleges as follows:

## PRELIMINARY STATEMENT

     1.    Amazon and its Chief Executive Officer ("CEO"), Jeff Bezos, hold themselves

out as among the foremost, most innovative companies and business leaders in the United States

and the world.  They have made "customer obsession" their top leadership principle.  Driven by

profits and greed, Amazon and Mr. Bezos are not, however, "employee-obsessed" in the same

way.  Their practices when it comes to hiring and promoting Black people and other

underrepresented minorities to high-level positions (and paying them commensurately)

perpetuate decades-old patterns of discrimination.  Like so many other Black and female

employees at Amazon, Charlotte Newman was confronted with a systemic pattern of

insurmountable discrimination based upon the color of her skin and her gender.  While Amazon

may be the largest on-line retailer and Mr. Bezos one of the richest men in the world, they are not above the law.  Ms. Newman, therefore, files this Complaint in an effort to hold Amazon and its executives accountable for their unlawful and discriminatory practices.

2.      In January 2017, Amazon hired Ms. Newman as a Public Policy Manager (a Level 6 position at Amazon), despite the fact that she had applied and was qualified for a higher-level position called Senior Manager (Level 7).  Within months of starting at the Company, she in fact was assigned and doing the work of a Senior Manager-level employee while still being paid at and having the title of the Manager level.  To make matters worse, and in defiance of the anti-discrimination laws, Ms. Newman was paid significantly less than her white coworkers, particularly in valuable Amazon stock.  If that were not bad enough, unlike her colleagues, Ms. Newman had to wait more than two and a half years for a promotion to the level at which she should have been hired in the first place, and at which level she had already been performing work for more than two and a half years.

3.      Many of Ms. Newman's colleagues observed a consistent practice of paying Black employees less than similarly situated white employees, and a near-total lack of Black representation in and very few women in the upper echelons of the group's leadership.  A group of Public Policy employees in Ms. Newman's group grew so demoralized and troubled by the lack of attention to these openly unequal conditions that, in or around September 2019, they composed a lengthy memorandum that made a series of highly detailed policy proposals to address racial and gender-based imbalances.

4.      Ms. Newman certainly is not alone among Amazon's corporate workforce in facing discriminatory treatment.  Based upon numerous conversations with other Amazon employees who are persons of color and/or women, the "de-leveling" of Black employees when

they are hired (i.e., dropping them a level below the job they applied and were qualified for or will be performing) is common, as is a longer wait for promotions for Black employees and women (particularly to high-level positions at Director (L8) and above).

5.      Ms. Newman reported her concerns about the impact of her race and gender on her employment to the Company on multiple occasions.  She talked with her managers repeatedly about how perceptions of Black and female employees on the part of managers could prevent them from succeeding at the Company, including how stereotypical views based upon characteristics such as race and gender can affect employees' advancement (and that she believed it had affected her, too).  She also participated in the creation of a document submitted to Amazon management on behalf of underrepresented minority employees pointing out significant systemic diversity-related issues at AWS.  In June 2020 she filed a written complaint about the vile and aggressive sexual assault and harassment committed against her by a senior male employee (which had distinct racial aspects as well), as well as regarding discriminatory attitudes by her managers and their impact on her.  Finally, in September 2020 Ms. Newman filed an administrative complaint with the Washington, DC Office Human Rights regarding racial and sexual harassment and discrimination at the Company.

6.      Recent reporting strongly confirms Ms. Newman's experiences, and conclusively shows that Amazon and AWS harbor Company-wide trends and attitudes that adversely impact Black employees and applicants.  See https://www.vox.com/recode/2021/2/26/22297554/bias-disrespect-and-demotions-black-employees-say-amazon-has-a-race-problem (last visited February 26, 2021).  This information comes not only from rank-and-file employees, but from diversity and inclusion managers at the Company.

7.      These practices and trends include frequent slotting of Black employees into jobs and "levels" that do not reflect their skills and qualifications (and pay them much less), much longer paths to promotion, and disinterest by some in Amazon leadership (including some on Jeff Bezos's elite "S-Team") when it comes to changing set practices that appear to have negative racial impact or listening to employees about how to address Amazon's issues on race, particularly regarding Black employees.

8.      Black employees who Ms. Newman talked with, as well as many Black employees who talked with reporters, consistently found that they and Black coworkers were slotted into Amazon job levels and compensation lower than their experience and credentials supported (unlike the general experience of white colleagues).  This longstanding practice affects Black employees' job authority, compensation (including stock awards), and prospects for promotion.  As with Ms. Newman, being put into a lower level has a strong negative, downward effect on an employee that echoes for years and can cost them millions of dollars in compensation.

9.      It is astounding that even highly specific instances of harassment that Ms. Newman has experienced as a Black woman at Amazon, such as a senior employee yanking on her hair or being told by a manager she is "too direct" and "scary," are echoed in incidents involving other Black female employees.  Other Black women at Amazon, and AWS specifically, report having coworkers touch their hair without consent or asking and being criticized for not smiling or being friendly enough (or being singled out as a Black woman who is "safe").  Other Black women also reported, as has Ms. Newman, having applied for jobs that the Company said were at a higher level, and then being hired by the Company at a lower level, a practice known as "down-leveling" or "de-leveling."  <u>See</u>

https://www.vox.com/recode/2021/2/26/22297554/bias-disrespect-and-demotions-black-employees-say-amazon-has-a-race-problem (last visited February 26, 2021).

10.     For the first three years of Ms. Newman's tenure at Amazon, 2017-2019, Amazon's Public Policy team did not hire a Black employee at the L8 level or promote any Black employees to L8.  From the Public Policy team's inception in the mid-2010s until December 2018, Amazon Public Policy did not hire any Black employees at the L7 level.  The first Black employees hired at the L8 level in Public Policy joined on or around September 21, 2020.

11.     Amazon's discriminatory conduct was not limited to paying Ms. Newman less than her white peers and discriminatorily failing to promote her for years after she had already taken on a more senior role.  Underlining Ms. Newman's vulnerable position at the Company, a senior male coworker also felt free to sexually harass Ms. Newman and at times in plain view of others.

12.     Racial and sexual discrimination exists in Amazon's corporate corridors, not just its warehouses—it simply takes a different form.  Amazon has failed to seriously grapple with these issues among its management.

13.     On May 31, 2020, six days after the murder of George Floyd under the knee of a Minneapolis police officer, Amazon posted the following tweet:



14.     The day before, on May 30, 2020, CEO Jeff Bezos posted a message on Instagram quoting an essay describing the strain and terrible impact on Black Americans caused by the killings of unarmed Black men and women by law enforcement (as well as other blatant displays of racism) in the United States, and the incompatibility of such stress with expectations of unflagging professionalism.[1]

15.     Andy Jassy is the CEO of AWS and is slated to succeed Mr. Bezos as CEO of Amazon in or around August 2021.  Also on May 30, 2020, Mr. Jassy also posted a message on June 2020, decrying police violence against Black Americans: "*What* will it take for us to refuse to accept these unjust killings of black people? How many people must die, how many

_____
[1] See https://www.instagram.com/p/CAzG5h8nWg5/ (last visited February 11, 2021).

generations must endure, how much eyewitness video is required? What else do we need? We need better than what we're getting from courts and political leaders."[2]

16.     Many of Amazon's employees and the public called out these superficial gestures, and recognized that they were far outweighed by Amazon's mistreatment of its Black workforce, including the vast majority of its Black employees who work in its warehouses and fulfillment facilities.  Just as Mr. Jassy expects better of the legal and political leaders of the United States, Ms. Newman and Amazon's employees expect better from their employer's executive and managerial leaders.

17.     Behind closed doors, Amazon and its leadership are more focused on attacking Black workers who speak up—and managing the public relations ("PR") fallout—than on addressing the conditions that led Black employees to protest and file legal claims.

18.     For example, Jeff Bezos participated in a March 2020 meeting in which the Company's General Counsel, David Zapolsky, openly mocked and strategized character assassination against a Black employee, Christian Smalls.  Mr. Smalls was fired after starting to organize employees at a warehouse on Staten Island and leading protests against unsafe work conditions during the pandemic.  Mr. Zapolsky said of Mr. Smalls, among other things: "He's not smart or articulate, and to the extent the press wants to focus on us versus him, we will be in a much stronger PR position."[3]  These degrading and vindictive statements, which reek of racial stereotypes and condescension, were confirmed by Mr. Zapolsky's own leaked notes.  Neither

---

[2] See https://twitter.com/ajassy/status/1266847181891203072 (last visited February 11, 2021).
[3] See https://www.vice.com/en/article/5dm8bx/leaked-amazon-memo-details-plan-to-smear-fired-warehouse-organizer-hes-not-smart-or-articulate (last visited December 11, 2020).

Amazon nor Mr. Bezos ever repudiated or expressed regret for these remarks.  Instead, in a

blatant act of retaliation, Mr. Smalls was fired.[4]

19.     Later in April 2020, a group of Amazon employees from across various wings of

the Company sent an impassioned email to Mr. Bezos and his S-Team (of which Andy Jassy is a

member), personally expressing the employees' shock and sorrow at Mr. Zapolsky's statements

about Mr. Smalls, which they found unmistakably racially offensive, as well as noting that the

Company had done nothing to address the impact of the discriminatory statements on Black

employees' concerns about how they fit in at Amazon.  The email outlined dozens of concrete,

highly detailed policy and process changes and ideas that would help ensure that

underrepresented minorities and women are equitably treated at Amazon, including but not

limited in connection with promotions.  To Ms. Newman's knowledge, the Company did not

issue any public response to the employees' email or implement any of even the smallest

measures recommended by the employees.  Ms. Newman also is unaware of any response to the

employees' email from Mr. Bezos.

20.     In early June 2020, right after Amazon posted its ostensible support for Black

individuals and opposition to injustice (and Mr. Bezos recommended that managers acknowledge

Black employees' trauma), Donald Archie II, a Black janitorial contractor at a Los Angeles

Amazon warehouse, was fired by the Company for taking a photo of racist graffiti in one of the

facility's bathrooms (unbelievably, for supposedly violating a policy on cell phone use).[5]

---

[4] Incidentally, an essay/editorial penned by Mr. Smalls in The Guardian shows that Mr. Zapolsky was wrong about
Mr. Smalls on all counts.  See https://www.theguardian.com/commentisfree/2020/apr/02/dear-jeff-bezos-amazon-
instead-of-firing-me-protect-your-workers-from-coronavirus (last visited December 11, 2020).
[5] See https://www.nytimes.com/2020/06/24/technology/amazon-racial-inequality.html and
https://www.theroot.com/jeff-bezos-says-black-lives-matter-but-will-he-make-a-1844169214 (both last visited
December 11, 2020).

21.     Amazon's workforce is fighting back against these consistent abuses, and in December 2020 the National Labor Relations Board (NLRB) ordered the Company to go forward with its first unionization vote in six years, at a warehouse facility in Bessemer, Alabama.  See https://www.cnbc.com/2020/12/22/amazon-moves-closer-to-facing-its-first-unionization-vote-in-six-years.html (last visited January 6, 2021).  The NLRB also found in December 2020 that Amazon had unlawfully terminated Staten Island warehouse employee Gerald Bryson in retaliation for his legally protected collective activity, soon after he had participated in and led protests of unsafe conditions and organizing efforts in March and April 2020.  See https://www.theguardian.com/technology/2020/dec/17/amazon-fired-warehouse-worker-nlrb-gerald-bryson (last visited January 6, 2021).  Mail-in balloting at the Alabama facility begins on February 8, 2021.[6]

22.     Punching down from the boardroom at Black employees who are pleading for a better, safer, more inclusive workplace does not match Amazon's and Mr. Bezos's professed dedication to social justice for Black Americans.

23.     When a company's top leaders traffic in stereotypes of Black employees and fail to condemn intimidation tactics, managers farther down the chain will take note of that *modus operandi* and behave accordingly.

24.     Black Americans are an afterthought in Amazon's operations to such an extent that it is even demonstrated in how the Company develops and sells technology.  Rekognition, which is a brand of facial recognition software developed and launched by Amazon in or around November 2016, has been found to misidentify Black individuals at a far greater rate than white persons.  At least one study found that, using photos of members of Congress, the Rekognition

---

[6] See https://www.washingtonpost.com/technology/2021/02/02/amazon-union-warehouse-workers/ (last visited February 11, 2021).

software had an alarming rate of matching up photos to a database of criminals incorrectly (and this rate was much higher for Black individuals).  Yet, for years, Amazon widely sold the product to police departments and law enforcement agencies across the United States—exposing the public, and Black citizens in particular, to arrest and lethal danger.  Mr. Jassy, AWS's top executive, in a PBS television interview said of the sale of Rekognition to police departments, "Let's see" whether law enforcement would "abuse the technology."[7]

25.     At an AWS Public Policy off-site meeting in September 2019, Ms. Newman publicly raised her concern to managers that there were no Black or female employees involved in formulating policy positions regarding Rekognition.  Her concern and suggestion were rebuffed.

26.     It was not until a public outcry arose over Rekognition's hazardous flaws and how it could impact Black people, potentially leading to unjust arrests and convictions and endangering lives, that Amazon announced that it would even temporarily, for one year, stop selling the software (without owning up to the racially disparate impact of the product or ceasing sales to federal law enforcement).[8]  In addition, Ring, an Amazon subsidiary that sells doorbell surveillance software and hardware, has partnered with approximately 1,300 police departments nationwide, forming a huge, warrantless surveillance network that also fuels suspicion and fear of Black and brown people in local communities.[9]  Mr. Jassy later, in September 2021, acknowledged in a Twitter thread that, "We still don't get it in the US. If you don't hold police

---

[7] See https://www.nytimes.com/2021/02/03/technology/andy-jassy-amazon-ceo-jeff-bezos.html#:~:text=SEATTLE%20%E2%80%94%20In%202002%2C%20Andy%20Jassy,founder%20of%20the%20online%20bookstore.&text=The%20idea%2C%20she%20said%2C%20was,thinking%20and%20anticipate%20his%20questions. (last visited February 11, 2021).

[8] See https://www.nytimes.com/2020/06/24/technology/amazon-racial-inequality.html; https://www.theguardian.com/technology/2018/may/22/amazon-rekognition-facial-recognition-police (both last visited December 11, 2020).

[9] See https://www.theguardian.com/technology/2020/jun/09/amazon-black-lives-matter-police-ring-jeff-bezos (last visited December 11, 2020).

depts accountable for the murdering of black people, we will never have justice and change, or be the country we aspire (and claim) to be."[10]

27.     Until August 2020, the elite management team curated by Mr. Bezos (the vaunted "S-Team") did not (unsurprisingly, given the above) have a single Black executive among its approximately two dozen members (as recently as 2017, only one woman was among its 18 members at the time), and Amazon's Board of Directors includes only one Black person (and has had only one other Black person on it in its 25-year history).  These trends in Amazon's leadership and workforce demographics show that Black people and other underrepresented persons of color are being kept out of the Company's upper ranks.

28.     Mr. Bezos has expressed reluctance and resisted calls for him to take bold steps to reinvent and diversify his S-Team, saying that, "I'm very happy that we don't have a lot of turnover on the S-team … I don't intend to change that — I like you guys [on the S-Team] a lot. I would expect any transition there to happen very incrementally over a long period of time."[11]

29.     The lack of Black representation in top management is all the more glaring and suggestive when considering that Amazon reports that approximately 26.5% of its employees identify as Black or African-American,[12] with the vast majority of the Company's Black employees (around 85% of them in 2014[13]) working in its warehouses.

30.     There is a distinct ceiling for Black employees in Amazon's corporate jobs.  The top Levels from Director (L8) on up, particularly in Ms. Newman's area, have nearly zero Black

---

[10] See https://www.nytimes.com/2021/02/03/technology/andy-jassy-amazon-ceo-jeff-bezos.html#:~:text=SEATTLE%20%E2%80%94%20In%202002%2C%20Andy%20Jassy,founder%20of%20the%20online%20bookstore.&text=The%20idea%2C%20she%20said%2C%20was,thinking%20and%20anticipate%20his%20questions. (last visited February 11, 2021).
[11] See https://www.cnbc.com/2018/11/19/bezos-new-shadow-adviser-at-amazon-is-a-woman-of-chinese-descent.html (last visited December 11, 2020).
[12] See https://www.aboutamazon.com/news/workplace/our-workforce-data (last visited December 11, 2020).
[13] See https://www.welcometothejungle.com/en/articles/racism-big-tech-amazon-warehouse-workers-speak (last visited December 11, 2020).

senior employees, and few women as well.  This imbalance and segregation of roles speaks

volumes about the low priority placed by the Company on advancing and hiring Black

employees into corporate roles, and how it makes the climb of even an excellent candidate and

employee like Charlotte Newman that much more steep.

      31.     The root cause of this sustained pattern of underrepresentation of Black and

female employees in Amazon's upper ranks can be detected in and traced to the stereotypical

perceptions of the Company's management.  Ms. Newman has observed and experienced these

racially and sexually discriminatory attitudes personally.

      32.     In November 2019, a coworker of Ms. Newman made the revolting remark that

Ms. Newman looked "like a gorilla" in a black jacket.  Such shocking racial insensitivity is

fostered by management's neglect of racial equity issues and the Company's lack emphasis on

workplace training and robust anti-discrimination policies.  This was by far not the only instance

of racially offensive and dismissive conduct Ms. Newman experienced from coworkers and

managers.

      33.     Charlotte Newman currently works at Amazon as a Senior Manager (Level 7).

She started at the Company in early 2017 after years of experience as a top advisor to U.S.

Senator Cory Booker and multiple members of the House of Representatives on financial

regulation and legislation.  Despite being qualified for and having applied for a role at the level

of Senior Manager (L7), however, Ms. Newman was hired only at the level of Manager (L6),

which naturally also came with substantially lower compensation.

      34.     Ms. Newman was paid at that lower level for nearly all of her first three years at

the Company, despite the fact that she was given and did the work of employees at the higher L7

level (including taking on assignments across North and South America, as opposed to only in

the United States).  Worse, this lower job level came with much lower awards of valuable

Amazon stock units, which have greatly increased in value and therefore magnify the

discriminatory pay disparity as time goes on.

35.    Amazon touts on its website its supposed record on pay equity, claiming that:

> "A review of the compensation awarded in 2019 at Amazon,
> including base, cash bonuses, and stock, shows that women earned
> 99.3 cents for every dollar that men earned performing the same
> jobs, and minorities earned 99.1 cents for every dollar that white
> employees earned performing these same jobs.  We continue to
> prioritize pay equity."[14]

36.    By using these broad statistics, however, Amazon is hiding the ball.  Even if

employees who are Black and/or female are in the "same job" (i.e., title or Amazon Level) as

white and male employees, they are consistently being slotted into lower titles and job levels that

do not reflect their qualifications or true role and responsibilities.  They are consistently being

underpaid for their qualifications and/or the work they are actually doing, while Amazon hides

this putting Black and female employees into lower titles and Levels where their white and male

coworkers also make less (but are functionally doing a lower-level job).

37.    Only Amazon employees who are at the Director (Level 8) level or higher have

access to detailed demographic and leveling data for the Company's workforce, contributing to

the lack of transparency and a feeling that management is relatively indifferent to employees'

input and desire regarding addressing diversity concerns.  Indeed, Amazon is out of step with

many of its peers at the top of the tech industry in this respect, as companies such as Facebook

(https://diversity.fb.com/read-report/) and Salesforce (https://equalitydata.herokuapp.com/ -

including a link to that company's annual EEO-1 Report) openly provide access to much more

detailed workforce data.

---

[14] See https://www.aboutamazon.com/news/workplace/our-workforce-data (last visited December 11, 2020).

38.     Amazon's discriminatory hiring, compensation, and promotion practices in corporate jobs reflect larger systemic racial and gender discrimination in the country.  Black women suffer an even larger pay gap as compared to white males than white women, and those disparities grow when looking at higher-paying jobs that require more education and experience. Black women with a Bachelor's degree and/or advanced degrees statistically earn 38% less than white men with the same level of education.  See https://leanin.org/data-about-the-gender-pay-gap-for-black-women (see footnote 5; last visited January 6, 2021).  In fact, 2019 Census data shows that in "Professional and related occupations," Black women make a median annual income of $51,974 and average income of $66,782, while white men make a median annual income of $81,860 and $110,059 on average.  See https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-06.2019.html (last visited January 6, 2021).

39.     Black women suffer a tremendous loss in earnings over their lifetimes to racial and gender discrimination combined, and this fact has been established in other studies as well, which noted unconscionable gaps in pay between white men and Black women with professional degrees (approximately $80,000 for Black women and $130,000 for white men annually—a gap of 39%), and which noted that the pay gap for Black women in Washington, DC is among the very worst in the nation (second only to Louisiana).  See https://nwlc.org/press-releases/the-wage-gap-costs-black-women-a-staggering-946120-over-a-40-year-career-nwlc-new-analysis-shows/ (last visited January 6, 2021); https://nwlc.org/wp-content/uploads/2019/08/Wage-Gap-for-Black-Women.pdf (last visited January 6, 2021).  See also https://www.payscale.com/data/gender-pay-gap (gender pay gap widens with career progression; last visited January 6, 2021); https://www.shrm.org/resourcesandtools/hr-topics/compensation/pages/racial-wage-gaps-persistence-poses-challenge.aspx (noting that Black

women's representation in high-wage occupations is less than half their representation in the overall workforce; last visited January 6, 2021); https://iwpr.org/wp-content/uploads/2020/08/Black-Women-Equal-Pay-Day-Policy-Brief.pdf (noting that if current statistical trends continued, the pay gap for Black women as compared to white men would not close for 110 years—in the year 2130; last visited January 6, 2021).

40.     Ms. Newman and other Black and female employees in corporate roles at Amazon have spent years doing work beyond the Level at which the Company has hired them, and they languish at these lower Levels and titles, falling behind their white and male comparators in compensation and promotions.  Therefore, Ms. Newman and other Black and female employees are underpaid, even if the others working at the same assigned "Level" are paid approximately the same amount—because, again, they and their white and male coworkers at the same Level are not doing the same job.

41.     Ms. Newman has worked extremely hard to advance the Company's interests and expand the reach of AWS's products inside and outside the United States, making inroads for its cloud-based products and services through meetings with the highest banking authorities in countries including Argentina, Brazil, Canada, Chile, Colombia, and Mexico.

42.     Ms. Newman has a track record of successful initiatives for AWS in the Americas, establishing relationships with high-ranking banking authorities, and securing approval for use of AWS's products with financial regulatory authorities.

43.     While doing her job and doing it extremely well, however, Ms. Newman also has had to contend with entrenched attitudes on the part of managers who are skeptical of and discount the contributions of Black and female employees at Amazon.

44.     On various occasions, Ms. Newman's then-direct manager at AWS, Steven Block, used stereotypical racial tropes when criticizing her about how she speaks in meetings, calling her "aggressive," "too direct," and (shockingly) "just scary."  Of course, these loaded critiques were directed at her despite the fact that being a contributor to group discussions is rewarded and praised among the Company's predominantly white and male workforce in her Public Policy group.  Ms. Newman immediately and sadly recognized these racial stereotypes and coded comments for what they were, but forged ahead.

45.     Other female employees also were subject to baseless, vague, and unwarranted judgments by managers, such as being deemed too "intense," despite male employees being praised for such personality traits.

46.     Amazon management's dismissive attitude towards Black and female employees like Ms. Newman left her vulnerable to sexual harassment and assault by a senior coworker, Andres Maz.  Mr. Maz, seemingly sensing her lower place in the pecking order and lack of protection or prioritization by management, engaged in repeated sexual harassment of Ms. Newman including repeated incidents of inappropriate, unwelcome touching and sexual assault.

47.     In January 2018, Mr. Maz felt free, at a dinner in Washington, D.C. with a third colleague present, to put his hand under a restaurant table and press on Ms. Newman's lap, close to her genitalia, and grab and grope her upper thigh.  Ms. Newman bolted from the table and returned only after some time, taking a seat away from Mr. Maz.  Apparently undeterred, Mr. Maz later harangued Ms. Newman outside the restaurant as she waited for her rideshare home, telling her to instead go home with him to have sex.  Ms. Newman told Mr. Maz that she would do no such thing.

48.     Months later, during a work trip to Seattle, Mr. Maz yanked on Ms. Newman's hair, which was in long braids, when she announced that she was leaving a bar where various coworkers had gathered, telling her to stay or leave her hair behind—a particular insult for a Black woman.  Later that evening, outside a different establishment, Mr. Maz unwelcomely put his arm around Ms. Newman and said to her, "Let's pretend we're boyfriend and girlfriend."

49.     These are only two of the various incidents of harassment that Ms. Newman had to deal with from Mr. Maz while they worked together.

50.     Ms. Newman is not alone among Amazon's corporate workforce in facing discriminatory treatment.  Based upon numerous conversations with other Amazon employees who are persons of color and/or women, the "de-leveling" of Black employees when they are hired (i.e., dropping them a level below the job they applied and were qualified for or will be performing) is common, as is a longer wait for promotions for Black employees and women (particularly to high-level positions at Director (L8) and above).

51.     In fact, Ms. Newman told Mr. Block that she believed that her gender, among other "features I can't help," posed an impediment to her career at Amazon due to differing perceptions of women and others in the workplace.  Mr. Block breezily dismissed that idea or possibility.

52.     As time went by, Ms. Newman continued to have to dodge Mr. Maz in the workplace and wondered how long she would have to wait for a promotion as she watched white peers get elevated to the next Level.  When the COVID-19 pandemic hit the United States in the spring of 2020 and Amazon's employees all had to work remotely, Ms. Newman no longer had to work side by side with her harasser and managers, and felt she could now formally report the discriminatory misconduct of her managers and Mr. Maz.

53.     Ms. Newman also felt a heightened sense of responsibility to come forward in light of the groundswell of protest against recent wrenching examples of racial injustice, including the murders of Breonna Taylor on March 13, 2020 and George Floyd on May 25, 2020.

54.     On June 19, 2020 (Juneteenth), Ms. Newman filed a written complaint that described in vivid detail the sexual harassment committed by Andres Maz during the first three years of her employment, and the discriminatory perceptions and practices of her managers.

55.     Ms. Newman was interviewed by an outside investigator and provided materials to aid the Company's investigation of Mr. Maz's and Mr. Block's conduct.  Yet, she received virtually no updates on the status of the investigation until learning in or around early October 2020, nearly four months later, that Mr. Maz had been terminated.  Amazon also told Ms. Newman that it would investigate whether discriminatory animus has affected her prospects at the Company, including her performance evaluations and consideration for promotion, though weeks again went by without any updates or information.

56.     Ms. Newman also experienced emotional distress when asked to join video calls with Mr. Maz, which was routine for team calls.  When she asked what steps the Company would take to ensure she could avoid e-mail, video, or any other interaction with Mr. Maz, she was given no response.  She had to follow-up with an Employee Resources Manager repeatedly for help.  The Company did not provide any direction to her until September, when Christopher Royle confirmed on a teleconference call on Chime that Ms. Newman did not have to join team calls with Mr. Maz.

57.     The termination of Mr. Maz did not solve or wipe away the effects of his harassment on Ms. Newman.  Nor has the Company taken any steps to remedy the professional

or financial effects of the opaque and subjective processes that kept her and other Black and female employees at lower levels, with decreased compensation, and out of upper management.

58.    In early June 2020, a couple of weeks before Ms. Newman filed her complaint, Amazon's General Counsel, David Zapolsky sent an email to the employees of Amazon's legal division, stating (emphasis added):

> "I do tend to agree with those who argue that the most constructive things that people who are privileged not to face this oppression in their daily lives can do, at least in the short term, are **listen and learn** from those who do, **redouble our commitment to be more effective antiracist allies and advocates**, and support organizations and **individuals seeking to address and mitigate** racial oppression, police violence, and **structural racism** in our society.  That is what I am trying to do and intend to keep doing as we move forward."[15]

59.    Despite these sentiments from the head of the Legal department that was soon investigating Ms. Newman's complaint about how important it is to "listen and learn" from those affected by racism, Ms. Newman was never consulted about how the Company could go about redressing the discrimination and treatment she and others faced.

60.    Amazon's investigation in fact found that Ms. Newman's supervisor, Mr. Block, had made stereotypical comments, and yet he suffered no consequences beyond receiving some training.  Despite these findings and the Legal department's supposed commitment to talk with employees affected by structural racism, Amazon failed completely to ask Ms. Newman what could be done to improve the workplace and its policies towards women and underrepresented minorities, including Black employees.

61.    In fact, the Company also completely failed to take any steps to ensure that Ms. Newman no longer had to have any contact with Mr. Maz at work in the months after she filed

---

[15] See https://www.vox.com/recode/2020/6/3/21279473/amazon-david-zapolsky-email-black-lives-matter-christian-smalls-covid-19 (last visited December 11, 2020).

her complaint.  Despite Ms. Newman sending a written request to Human Resources ("HR") in late July 2020, asking that the Company help her avoid contact with Mr. Maz, even over video conferences, in light of her complaint, she did not receive any response and the Company did nothing.  Instead, Ms. Newman was left to deal with the situation on her own.

62.     On June 18, 2020, the day before she filed her complaint, Amazon posted a message on Twitter that read, in part: "spark conversation and exploration about how we—as individuals, teams, and a company—can continue to be active participants in dismantling systemic racism, oppression and inequality.  Our work is not done, and we still have a long way to go."  On that, Ms. Newman and Amazon agree.

63.     Ms. Newman now brings this action to redress the unlawful employment practices committed against her, including Defendants' discriminatory treatment towards and harassment of her due to her race and/or color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), due to her sex/gender in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"), and with regard to her gender/sex and race and/or color under the Washington, D.C. Human Rights Act, D.C. Code § 2-1402.11 ("DCHRA").

## **ADMINISTRATIVE PROCEDURES**

64.     On March 8, 2021, Ms. Newman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII.

65.     On April 12, 2021, Ms. Newman received a Notice of Right to Sue from the EEOC.

66.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

67.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and/or local law pursuant to 28 U.S.C. § 1367(a).

68.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

69.     Plaintiff Charlotte Newman is a Black woman and Head of Underrepresented Founder Startup Business Development at Amazon Web Services, Inc.  Until recently, Ms. Newman held the position of Head of Financial Services Public Policy, Americas at AWS.  At all relevant times, Ms. Newman met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

70.     Defendant Amazon.com, Inc. is a Delaware-registered domestic corporation with operations in Washington, D.C.  At all relevant times, Defendant Amazon.com, Inc. met the definition of "employer" and/or "covered employer" under all applicable statutes.

71.     Defendant Amazon Web Services, Inc. is a Delaware-registered domestic corporation with operations in Washington, D.C.  At all relevant times, Defendant Amazon Web Services, Inc. has been a wholly owned subsidiary of Defendant Amazon.com, Inc. and met the definition of "employer" and/or "covered employer" under all applicable statutes.  Amazon.com, Inc. and AWS share facility, administrative functions, and employee management functions and resources.

72.     Defendant Andres Maz is, upon information and belief, a resident of Washington, D.C., and formerly worked as a Director of Public Policy at Amazon Web Services, Inc., where he supervised Ms. Newman during her employment at the Company, and controlled the terms and conditions of her employment.  At all relevant times, Defendant Maz met the definitions of "employer" and/or "covered employer" under all applicable statutes.

73.     Defendant Steve Block is, upon information and belief, a resident of Washington, D.C., a Director of Public Policy, U.S. Federal at Amazon Web Services, Inc.  He supervised Ms. Newman during her employment at the Company and controlled the terms and conditions of Ms. Newman's employment.  At all relevant times, Defendant Block met the definitions of "employer" and/or "covered employer" under all applicable statutes.

74.     Defendant Shannon Kellogg is, upon information and belief, a resident of Washington, D.C., is Vice President of Public Policy at Amazon Web Services, Inc.  He supervised Ms. Newman during her employment at the Company and controlled the terms and conditions of Ms. Newman's employment.  At all relevant times, Defendant Kellogg met the definitions of "employer" and/or "covered employer" under all applicable statutes.

## **FACTUAL ALLEGATIONS**

## I.      **MS. NEWMAN'S RECRUITMENT TO, CAREER, AND POSITION AT AMAZON**

75.     Ms. Newman is a graduate of Harvard Business School, where she earned her M.B.A, took more than the required amount of finance courses, and obtained a coveted Summer Associate position with State Street during the summer of 2009, working on the sales and trading foreign exchange desk.  She also completed an immersion program in China, where she studied the country's financial system.  She served for more than three years as an economic policy

advisor to Senator Cory Booker from late 2013 to early 2017, after spending around a year as Senior Legislative Assistant to Congressman Dan Kildee of Michigan.

76.     Before that, Ms. Newman was a co-founder and Chief Operating Officer (COO) of Team Fenom, a women's sports news and lifestyle startup and digital media platform established to increase coverage of women's sports, which she built the business model for, operated, and led for around two and a half years from 2010 to 2013.

77.     Ms. Newman's financial services policy acumen and experience was substantial before she joined Amazon, and she had over seven years of financial services policy experience before starting work at the Company, including drafting legislation, amendments, and congressional memoranda.

78.     As a senior advisor to Sen. Booker, she advised him on banking policy and other economic matters, joining meetings and calls with Cabinet members and President Barack Obama.

79.     She also managed the development of major pieces of legislation, including Sen. Booker's first bill as a United States Senator.

80.     Before attending business school, she led financial services policy work for then-Congressman Chris Murphy, now U.S. Senator.

81.     At that time, Sen. Murphy was a member of the House Financial Services Committee.

82.     Ms. Newman oversaw important matters involving then-Congressman Murphy's participation in the Committee from around February 2007 to May 2008, including hearings on the national mortgage crisis.  She also served as a policy advisor to then-Rep. Murphy on areas including financial services, small business, tax, and trade.  Ms. Newman also wrote the

reauthorization of housing legislation that later became law and played a major role in financial services policy development for Congressman David Scott (who was on the House Financial Services Committee) from around October 2005 to February 2007, who she also advised on issues regarding small business, budget, and tax issues.

83.     This experience has proven essential in several signal AWS achievements in the financial services area during Ms. Newman's tenure at the Company.  Even before she was hired, her background in government positioned her as a very well-qualified candidate for a L7/Senior Manager position at Amazon.

84.     In early January 2017, Ms. Newman started working at Amazon as a Public Policy Manager (an L6 position) on the Americas Public Policy team.

85.     Two months before, in late October 2016, Ms. Newman had a phone interview with Steve Block, then a Senior Manager, U.S. Federal with AWS (Mr. Block later became Global Director, Public Sector).

86.     After that interview, Mr. Block took the unusual step of having Ms. Newman come to meet him in person, but strangely did not take the opportunity to ask her any substantive questions—it appeared as though he simply wanted to see her in person.

87.     Only at that point was Ms. Newman put into a formal "loop" in order for her candidacy at Amazon to proceed.

88.     Although Ms. Newman had interviewed and was qualified for an Americas-wide position at the L7 level (Senior Manager), in November 2016, she ultimately was offered only an L6 role (Public Policy Manager), which she accepted after a call with the recruiter voicing her objections and hesitation.

89.    The job description for the Level 7 role she applied for, which was Senior Manager, Financial Services, Public Policy, AWS, stated in pertinent part that the employee in the role would "represent Amazon Web Services (AWS) before the financial sector (associations, regulators, federal departments and other government decision makers) **in the US and countries such as Canada and Mexico**. You will address risks and opportunities for the business at the federal, state **and international level**." (emphasis added).

90.    Mr. Block told Ms. Newman that the scope of the role she was being hired for had been de-leveled and scaled back to be U.S.-only, rather than covering areas outside the United States and/or across the Americas, and that there was no room at all for negotiation on compensation.  Ms. Newman was not told that she did not meet any of the qualifications for the Level 7 role.  In fact, based upon her experience and other qualifications, Ms. Newman therefore seemed to have satisfied the criteria for the role.

91.    She was dismayed by the de-leveling and concerned about the lack of negotiation, but was excited by the prospect of working at Amazon.

92.    She also, at that time, could not fully know the professional and full financial implications of this de-leveling, nor was she aware of the extremely steep climb required for a promotion.

93.    However, within three or four months of starting at the Company, Ms. Newman was performing work that was at least at the L7 level, such as LATAM public policy work. Soon after that, her assignments included work in Chile related to outsourcing and cloud-based operations.

94.    Indeed, Ms. Newman led the Company's efforts to file a formal comment letter with the banking regulator in Chile in the fall of 2017.

95.     By the first couple of months of 2018, Ms. Newman was reporting to the head of Public Policy, Americas and delivered a successful presentation to the president of Brazil's Central Bank.

96.     Her presentation was integral to a favorable outcome in ongoing discussions with the Central Bank of Brazil regarding a consultation on outsourcing and cloud services.

97.     Other successes of Ms. Newman's included, but were by no means limited to: successfully advocating to halt the designation of AWS as a systemically important financial market utility by the U.S. Treasury Department; securing changes to a Comisión Nacional Bancaria y de Valores (CNBV) regulation for fintech companies in Mexico, resulting in the removal of a requirement for physical addresses; and obtaining an agreement from Argentina's central bank to clarify their existing audit requirements in order to provide assurance to financial services customers that they could use AWS and remain compliant with existing rules.

98.     In recognition of her excellent performance and high-level work, Ms. Newman was promoted in October 2019 and given the title of Head of Financial Services, which became effective in November 2019.

99.     Ms. Newman's credentials and job experience thoroughly qualified her for an L7-level job position at Amazon at the time of her hiring.  Indeed, not all candidates hired for Level 7 roles in the Public Policy area had ten years of relevant experience (as listed under "Basic Qualifications" for this Level 7 role) when starting at Amazon, and some of Ms. Newman's white male colleagues who started at Level 7 (and therefore were paid substantially more) for work in similar roles (Senior Manager and/or "Head of" a policy area) had less job experience then she did.

100.    Based upon Ms. Newman's experience as a candidate and interviewer at Amazon, the quality and type of a candidate's relevant experience can easily make up for a difference in number of years of experience.  In addition, Public Policy employees brought in at Level 6 (two recent Public Policy hires at that level were white women) also typically had significantly less relevant experience than Ms. Newman did and also generally did not have graduate degrees (although some Level 7 or even Level 8 hires who are white males also did not have such degrees).  A white male employee hired at Level 8 in the same year as Ms. Newman, 2017, had only somewhat more years of experience than her.

101.    Ms. Newman's number of years of relevant experience before Amazon was comparable to or even compared favorably to those of at least two white male colleagues in Public Policy who reported to or worked with Mr. Kellogg, one of whom was hired at Level 7 and both of whom were promoted to Level 8.

102.    Based upon Ms. Newman's understanding from work discussions and publicly available information, at least two other white male colleagues in Public Policy also seemingly had comparable qualifications when they started work at Amazon in the same year or around the time that she did, yet these men were hired by Amazon as Senior Managers at Level 7 (the level at which Ms. Newman worked from soon after her hiring, despite being slotted and paid as an L6 Manager), though those two coworkers have not been promoted to Level 8.

103.    In addition, Ms. Newman's policy remit and scope of responsibilities as a Level 6 Manager was, in fact, broader than that of at least two and was at least as broad as the policy areas covered by all four of these white male comparators who were working as Senior Managers (L7) and/or Directors (L8) during her time in Public Policy.  Ms. Newman's international role and regular responsibilities meeting with senior government and AWS

officials, among various other responsibilities, were more in keeping with L7 and even L8 job

duties (which also by definition come with higher pay).

104.    White employees, including white female employees, were promoted at a faster

pace than Black employees, even when the Black employees work in similar roles and have

similar or even better performance (as Ms. Newman did).  This pattern held true with the above

white male comparators who were elevated to Level 8 as well.

105.    Even more importantly, Ms. Newman, within months of starting at Amazon, was

assigned and assumed a role and job duties (and ably performed those duties) that were at an L7

level, even if she was not paid at or elevated to that level for more than two years.  Indeed, early

in her tenure she performed work and took on roles in which her peers and counterparts were

Directors (L8) and even VPs (L10), with whom she regularly had calls on projects and

initiatives.

106.    That Ms. Newman was performing work across the Americas is amply

documented not only through her work product and associated documents and communications,

but in her highly positive performance evaluation feedback, some of which notes that she

assumed such duties not long into her first year with Amazon.

107.    Ms. Newman was the only person on her policy team who was still at an L6 level

while supporting a multi-billion-dollar business for Amazon.  She had an enormous role not in

line with her L6 level, but rather clearly in keeping with L7 roles, and many of her duties or

assignments were ones typically performed by L8 employees.  Due to this de-leveling of Ms.

Newman by the Company, she was persistently under-resourced and unsupported, and in fact

was not even given the staff that a typical L6 employee would get in her area (e.g., at least one

intern).

## II.  MS. NEWMAN FACES REPEATED SEXUAL AND RACIAL HARASSMENT AND DISCRIMINATION AT AMAZON, INCLUDING DISPARATE TREATMENT

108.    On or around June 19, 2020, Ms. Newman filed a formal, written complaint that described in vivid detail the sexual and racial harassment committed by Andres Maz during the first three years of her employment, including many of the incidents related below.

109.    In or around the second quarter of 2017, Ms. Newman began working with Andres Maz, a Senior Manager (later a Director) of Public Policy at AWS.

110.    Mr. Maz was an L7 employee and senior to Ms. Newman, and nearly immediately began exhibiting unusual behavior towards her, as he early on presented her with a gift of a notebook decorated with stickers by his daughter.

111.    In or around October 2017, when Mr. Maz and Ms. Newman were in Santiago, Chile on business, they had dinner at a restaurant called Karai in the Hotel W (purely as colleagues from Ms. Newman's point of view).  At dinner, Mr. Maz hit on her.  He looked her directly in the eyes and called her "beautiful."

112.    Ms. Newman, though shocked and highly uncomfortable, decided to brush the comment off and refrain from filing a complaint about this inappropriate conduct for fear that it would harm her career at Amazon and result in retaliation by Mr. Maz and/or her direct supervisor, Mr. Block.

113.    Significantly, it was around this time (October 2017) that the head of Amazon Studios, Roy Price, was revealed to have been accused of sexual harassment in 2015 but had suffered little consequence.

114.    Amazon tried to address employees' concerns about the revelation regarding Mr. Price by sending an all-staff email promising to review its policies on sexual misconduct.

115.     However, this conspicuously did not address at all why the Company had allowed Mr. Price to stay in his powerful position despite the credible allegations, rather than merely have him undergo some training and/or be remonstrated about watching how much he had to drink at Company events.[16]

116.     This news did not inspire much confidence among Amazon's employees regarding how robust and protective the Company's procedures on sexual misconduct are. Indeed, other conduct by her manager, Mr. Block, discussed in greater detail below, also undermined Ms. Newman's confidence in Amazon's internal anti-harassment procedures and led her to believe she would not be supported if she came forward, and therefore should not raise her concerns at that time.

117.     A few months later, on or around January 18, 2018, Mr. Maz sexually assaulted and forcefully propositioned Ms. Newman.

118.     Mr. Maz did this during and immediately after a dinner at the restaurant Zaytinya in Washington, D.C. with Ms. Newman and a new colleague (Aisen Etcheverry), who they were welcoming to the Company.

119.     During the dinner, Mr. Maz was lavishly praising Ms. Newman to an over-the-top and uncomfortable degree, strangely and repeatedly calling her "so great," saying "I really like this girl," and asking Mr. Etcheverry questions such as "Don't you think she's great?"

120.     At one point, Mr. Maz made a motion as though to give Ms. Newman a high-five, but instead grabbed her hand and interlaced his fingers with hers.

121.     Later in the dinner, Mr. Maz stood up and moved from the side of the booth where he was sitting with the third person in order to sit right next to Ms. Newman.

---

[16] See https://www.nytimes.com/2017/10/20/technology/amazon-sexual-harassment.html (last visited December 11, 2020).

122.     He then put his left hand under the table and pressed on Ms. Newman's lap, in proximity to her genitalia, then grabbed and groped the upper thigh of her right leg.  This touching was sudden, unwelcome, and appalling to Ms. Newman.

123.     Ms. Newman was momentarily frozen and terrified by what was happening, it was such a shocking and outrageous thing for anyone to do, but then had the instinct to stand up and blurt out that she needed to use the restroom.

124.     She took time in the restroom to gather herself and regain her composure, make sure that she recalled precisely what happened, tried to give enough time so that when she came out she would not obviously appear to have been crying or distraught, and returned to the table when she was ready.

125.     She, of course, sat next to Mr. Etcheverry when she went back, and the dinner ended soon after.

126.     However, while Ms. Newman waited for an Uber to pick her up, Mr. Maz reapproached her and began to persistently badger and implore her to go home with him to have sex.

127.     Ms. Newman was unsettled by this blatant sexual harassment, particularly alone at night, and in the wake of Mr. Maz's physical, sexual assault earlier that same night.

128.     Ms. Newman told Mr. Maz flat out that she did not want to and would not have sex with him.

129.     Mr. Maz continued begging her to go home with him for sex and ignored her objections.

130.     Ms. Newman was finally able to get into her rideshare but got little sleep that night due to this misconduct and thoughts of what could follow.

131.    The next day, in a seeming attempt to explain away or clean up his behavior, Mr. Maz texted Ms. Newman, saying that he was not feeling well.

132.    Rather than respond in writing to his text calling him out for his harassment, which she believed could lead to retaliation and negative consequences at the Company, Ms. Newman took the opportunity later in the day to verbally tell Mr. Maz that his conduct was completely unwelcome and crossed the line, and that she was interested only in strictly professional interactions with him.

133.    Ms. Newman also memorialized these events in an email to a friend, including her fears regarding what Mr. Maz could do in the future and considering whether reporting his conduct could ruin her own career.

134.    Mr. Maz's misconduct had significant continuing effects on Ms. Newman.

135.    Over course of the remainder of the year and into 2019, Ms. Newman altered her behavior by avoiding working in the office she had been assigned to share with Mr. Maz (as of April 2018), increasing the number of days she worked from home, and using common work areas such as the kitchen or conference room to do her work.

136.    When traveling for work, Ms. Newman ensured that she stayed at a different hotel from Mr. Maz and was on different flights.

137.    For obvious reasons, Ms. Newman felt the need to continue to do this, even after she noticed that Company management seemed somewhat displeased by her new workspace preferences (she was told that she could not get a different office assignment—with no follow-up inquiry as to why she might want or need one).  In addition, her manager Mr. Kellogg, expressed displeasure with her working from home.

138.     Mr. Kellogg relied upon Mr. Maz almost entirely for his impressions and feedback on Ms. Newman, giving Mr. Maz substantial influence over Ms. Newman's possible promotions, compensation, and other terms and conditions of employment.  Mr. Maz regularly assigned work to Ms. Newman and supervised teams of employees she was part of, which continued for years all the way into the middle of 2020.

139.     Indeed, Ms. Newman's progress at Amazon was held up for years by Mr. Kellogg and Mr. Maz by proxy.  Mr. Maz had substantial influence over Mr. Kellogg's assessment and understanding of Ms. Newman's work and performance, and Mr. Kellogg completely deferred to Mr. Maz, including but not limited to regarding her performance on AWS business in Latin America.

140.     In addition, there were many overlapping and preexisting personal and professional relationships among the Directors and VPs within Ms. Newman's group. By way of example only, a close friend of Mr. Block, Brian Huseman, was one of the most feared and senior Vice Presidents within the Public Policy group.  Mr. Huseman brought friends into the Amazon fold and protected them, including people who are Directors.

141.     In addition, Mr. Maz also had at least two colleagues from a previous employer, Cisco, in the group, at least one of whom still works at the Company in a high-ranking position.

142.     These many interlocking relationships and loyalties, along with a near-total lack of diversity at the top of the Public Policy group, created a situation in which Ms. Newman was left without another Director or Vice President in her group to whom she could report the discrimination and harassment she was experiencing.

143.     Ms. Newman did not feel supported or that she would get a fair hearing or be fully backed by her team's managers if she came forward regarding Mr. Maz.  This feeling was

strongly reinforced by her managers' racially charged stereotyping comments and criticisms. Mr. Block deeming Ms. Newman "scary" and dismissing her concerns about her gender and other characteristics (i.e., race) affecting her prospects at the Company were only two examples of many such incidents and facts that demonstrated that her complaint would not be heard or would damage her at Amazon.

144.    Ms. Newman already was one of the more senior women in her area (it appeared that all of the senior people on the team who would be discussing the matter would be men, and a woman was not promoted to Director on her team until around July 2020).

145.    Further, during 2017, she was the only Black person on her team globally. Therefore, she did not feel there was someone who she was completely comfortable going to who she also believed could or would take any action and protect her from retaliation or other negative impact from reporting the harassment.

146.    After more than a year of Ms. Newman doing her best to keep her distance from Mr. Maz, on or around September 19, 2019, he again took an opportunity to sexually harass her, this time during a team off-site in Seattle, Washington.

147.    This was the same off-site that Ms. Newman publicly raised concerns with managers, in a group setting, regarding the lack of women and particularly Black employees in the formulation of the Company's policy positions regarding the facial recognition software, Rekognition.  Ms. Newman's concerns were rebuffed by management, and she was not permitted to participate in policy discussions regarding the controversial software which were dominated entirely or nearly entirely by white men.

148.     This incident of harassment and assault by Mr. Maz underscored the fact that Amazon failed to take reasonable measures or care to avoid harassment of employees outside the workplace and emphasize the need for employees to report harassment they have witnessed.

149.     Ms. Newman was at a hotel bar (the rooftop of the Thompson hotel) with colleagues, and Mr. Maz also was there.

150.     Ms. Newman wanted to leave, but when she announced that she was turning in, Mr. Maz insisted that she stay, laughed, and yanked hard on her hair, as her hair was in long braids at the time.

151.     "You can leave this behind," Mr. Maz said laughingly while forcefully pulling down on her braids with his full fist.  This was an unmistakable mockery of Ms. Newman's hair as a Black woman by Mr. Maz—threatening to keep her hair and mockingly telling her that she could just leave it behind with him.

152.     Ms. Newman was very upset and mortified by this new violation of her physical boundaries, roughly touching her hair (particularly offensive and mocking of a Black woman) and very uncomfortably pulling on her in front of her colleagues, and even more so given what Mr. Maz had done to her before.

153.     The group, however, insisted that Ms. Newman stay to get some food at a nearby restaurant and receive a belated toast for her birthday.

154.     Outside a pizza restaurant as the group waited for a table, Mr. Maz turned up again and sidled up to Ms. Newman.

155.     Mr. Maz locked his arm in hers and pulled her close to him.

156.     "Let's pretend we're boyfriend and girlfriend," he said to her, and also said something in Spanish that she did not catch.

157.    Once the group was seated, Ms. Newman made sure to get a seat away from him, but when she was standing at one point, Mr. Maz got up from his seat and repeatedly put his arm around her.

158.    This sexually and racially harassing conduct at yet another off-site work event by Mr. Maz, in front of several coworkers, underlines Amazon's failure to take reasonable measures to prevent and respond to such misconduct and violations of the Company's nominal policies. Upon information and belief, neither Amazon nor any of the individuals present took any action regarding Mr. Maz's public sexual harassment, with its racial aspect as well, until Ms. Newman filed her written complaint.

159.    The importance of identifying and recognizing such misconduct among members of management is emphasized by the fact that Mr. Maz, soon after this off-site, attempted to take a lead role on a gender inequality taskforce that had been formed to address issues raised about the dearth of women on the Company's global leadership team and in management generally.

160.    Clearly, Mr. Maz is not someone who Amazon would want to lead any efforts intended to alleviate discrimination or foster an environment more conducive to promoting female leaders.

161.    In the months following Mr. Maz's harassment, Ms. Newman continued to fear that he would repeat his behavior or that he and management would retaliate against her if she filed a complaint about it.

162.    His conduct and these serious concerns interfered with Ms. Newman's sleep, and affected her health (including insomnia and stress-induced headaches and migraines), as did the stress of trying to avoid contact with Mr. Maz on a weekly basis.

163.    Ms. Newman even felt compelled to delay updating her home address in the Company's system to avoid him getting that information.

164.    Ms. Newman still at times develops a catch in her voice and cries at times when she recalls and recounts these events, and has talked with a therapist about her experiences.

165.    Ms. Newman believes that, as a Black woman, she likely was perceived as less influential and a more vulnerable target for sexual harassment by Mr. Maz.

166.    Research and analysis in recent years shows a statistically evident trend in which Black women experience harassment more frequently relative to their white female colleagues.[17]

167.    Such a *modus operandi* would be in keeping with other patterns Ms. Newman has observed and experienced at the Company, in which the advancement of Black women and African-Americans generally has suffered systematically.

## III.    AMAZON ENGAGES IN A PATTERN OF HIRING BLACK EMPLOYEES AT LOWER LEVELS THAN COMPARABLE WHITE EMPLOYEES, LESSENING THEIR INCOME AND CAREER PROSPECTS, AND PERPETUATING RACIAL <u>DISPARITIES</u>

168.    Based upon conversations with various colleagues, Ms. Newman has learned that many of Amazon's Black and Latinx employees believe that people of color at the Company are often de-leveled; that is, they are hired, assigned, or kept at Levels that are not commensurate with their prior experience and/or job responsibilities.

169.    These practices lead to lower compensation for Black employees in corporate roles, particularly smaller securities awards/equity tranches, etc., which has a particularly large impact on compensation at a Company such as Amazon, where a large portion of compensation

---

[17] See, e.g., https://psmag.com/news/black-women-are-more-likely-than-white-women-to-report-sexual-harassment (last visited December 11, 2020); https://journalistsresource.org/studies/economics/workers/sexual-harassment-assault-health-discrimination-race/ (last visited December 11, 2020); https://www.nationalpartnership.org/our-work/resources/economic-justice/fair-pay/african-american-women-wage-gap.pdf (see footnote 21; last visited January 6, 2021).

is paid in stock (and where these disparities only continue to grow over the years, with increases in stock values).

170.     Subjective, opaque processes for determining employee stock awards also contributed to this discriminatory trend and the belief among persons of color among Amazon's workforce that such disparate treatment and practices, and their negative effects, are widespread.

171.     Managers at Amazon also have engaged in a pattern of conduct during Ms. Newman's employment that demonstrates stereotypical attitudes towards women and Black employees, which has resulted in disparate treatment, leading to a lack of advancement of and inequitable compensation for such employees, including Ms. Newman.

172.     Early in Ms. Newman's tenure, her manager, Steven Block, began making comments and displaying an attitude indicating dismissiveness and insensitivity towards Black and female employees.  For instance, shortly after Ms. Newman started work in January 2017, Mr. Block presumptuously told her that she needed to learn financial services policy, despite Ms. Newman's background in that area, which he seemingly discounted or disregarded.

173.     When Ms. Newman had been offered a Level 6 position at Amazon, she met Mr. Block in person at a café and wore her hair naturally to the meeting (as she often did while working in Congress), which seemed to surprise Mr. Block.  He stared at Ms. Newman's hair throughout their sit-down, barely meeting her eyes.  This conduct, unfortunately familiar and recognizable to Ms. Newman, drove her to ensure that she changed her hairstyle before starting work at Amazon.

174.     Mr. Block and Mr. Kellogg also would take note of Ms. Newman's clothing (particularly if she wore something colorful or with "personality") far more often than seemed normal if it were only due to happenstance, further showing that Ms. Newman's appearance was

under the microscope and constantly being apprised by her managers.  Ms. Newman's white

male colleagues did not have to put up with or endure such scrutiny of their dress or appearance.

175.    By way of further example only, on March 22, 2017, when Ms. Newman attended

a reception on Capitol Hill with various senior team members, Mr. Block asked her out of the

blue, "How old are you?"

176.    Ms. Newman tried to deflect, and asked why he was asking, but he kept pursuing

the issue and asking about her age.

177.    She finally had to tell him because he would not let it go and said that she was 35

years old (at the time).

178.    Mr. Block's eyes widened and he exaggeratedly declared, "Oh, good for you,"

and made a big point that Ms. Newman looked younger than her age.

179.    Ms. Newman was made very uncomfortable by a senior manager commenting on

her age and, obviously, her appearance and looks on top of it.

180.    One wonders just how young Mr. Block believed Ms. Newman to be, and whether

he found her more attractive than her age might suggest to him, or if he had been questioning the

presence or importance of a team member who apparently looked so young to him.  It also struck

Ms. Newman as telling that her hiring manager, who presumably would have reviewed her

resume, clearly did not grasp her years of experience.

181.    Either way, Mr. Block's inappropriate and pointed questioning of Ms. Newman

displays discriminatory attitudes concerning women and even tired stereotypes about the

supposed greater difficulty of discerning a Black person's age from his or her appearance.

182.    Later, Mr. Block made comments indicating stereotypical beliefs about Black

people and women using sadly common racially charged language.

183.    Mr. Block, who was Ms. Newman's first manager at Amazon, also told Ms. Newman on multiple occasions (and during a check-in meeting on or around July 12, 2017, in particular) that she was "too direct," "aggressive," and (extraordinarily) "just scary."

184.    He also said that, "You can intimidate people."

185.    Regrettably, Mr. Block said these things regarding Ms. Newman voicing her ideas and perspectives in work meetings.

186.    These statements had a terrible effect on Ms. Newman and chilled her from participating in group work discussions, which are key to one's visibility as a potential leader and advancement at Amazon.

187.    Ms. Newman bravely responded to Mr. Block by saying that she believed it was possible that perceptions of her and her speaking up in meetings may have been impacted by "features I can't help," including her gender, and that women often get vague, subjective feedback that focuses on "soft" factors (which is not in line with Amazon's supposed principles emphasizing objectivity and commitment to fairness).

188.    Mr. Block, in response, was dismissive.

189.    He leaned back and said, airily, "I don't know about that."

190.    Ms. Newman had intentionally omitted an express, direct reference to her race in the earlier exchange, for fear of escalating the situation and harming her career.  Her suggestion that her race and color were among the "features that she cannot help" and which affected her prospects at the Company was obviously understood by Mr. Block in this discussion.

191.    However, Ms. Newman's manager later conceded that he could do a better job communicating feedback to her.  Ms. Newman noted to Mr. Block in a conversation on or around September 25, 2017, that her status as an African-American woman could "define"

perceptions of her in the workplace, and that unconscious bias and "coded" language were part of that "in ways I can't help." In response to this, Mr. Block said, "I think that's fair."

192.    Ms. Newman pointed out to Mr. Block that she had conversations with other women at Amazon about diversity concerns for women and other under-represented groups, and a lack of diverse "point people" in global corporate affairs.

193.    Mr. Kellogg also displayed disdain and fear deriving from stereotypes regarding Black city dwellers, and, by way of example only, said something to Ms. Newman regarding a news story about a woman being shot in Washington, D.C., to the effect that things like that are why he lives in Virginia and is glad he can have a gun there.

194.    In addition, Ms. Newman told Mr. Block about a female coworker from outside their team who on two occasions had a coworker make "jokes" about how women have smaller brains than men. Ms. Newman further noted that this coworker did not feel that she could report this conduct at the Company. Mr. Block confirmed that the coworker worked on a team within Public Policy, expressed that he was "shocked" by such comments, yet he did nothing to follow up on this information with Ms. Newman.

195.    A Black man employed in Public Policy (and who was the only other Black employee on the broader team for a significant time) told Ms. Newman that he faced significant disadvantages and was being pushed out of his group and perhaps the Company. He expressed that he felt that this was happening to him because he is a Black man.

196.    A Black female contractor told Ms. Newman that she had concerns about Mr. Kellogg's racial sensitivities, and that he would email her to ask about Ms. Newman's whereabouts or when Ms. Newman had arrived at work, as though she would somehow know

because she was another Black colleague. This conduct made the contractor uncomfortable and also filled her with apprehension on behalf of Ms. Newman.

197.    Such comments and discussions were very dispiriting to Ms. Newman, and had a significant impact on her confidence and self-image, causing her to second-guess herself and hesitate to present or build upon ideas on email threads or in meetings.

198.    Mr. Maz, through his frightening harassment, and Mr. Block, with his demeaning conduct, humiliated Ms. Newman and shook her confidence, both in herself and the Company.

199.    Ms. Newman, as a Black woman in the process of climbing to the upper ranks of the professional world, felt particularly compromised and threatened by her managers' actions, particularly while under an increased burden and pressure to make a good impression and demonstrate competence to her supervisors and colleagues.

200.    In addition, Mr. Block and his manager, Shannon Kellogg (Vice President, AWS Public Policy, Americas), frequently complained about the personalities of other female employees, which is not their common practice regarding men under their supervision.

201.    As one example, Mr. Kellogg incongruously characterized a female employee as "very intense," without apparent basis.

202.    On another occasion, when meeting with Ms. Newman, Mr. Kellogg unaccountably declared, "I'm not sure I see you as a manager." Again, Mr. Kellogg received much of his information regarding Ms. Newman and her work from Mr. Maz.

203.    Due to this conduct by Mr. Kellogg and Mr. Block, and Mr. Maz's position of influence with them, Ms. Newman could not report Mr. Maz's harassment to any of her direct managers. In addition, she feared imminent and serious retaliation for any such complaints,

particularly given the Company's minimal policies regarding how an employee who has suffered harassment and discrimination should proceed.

204.    Many women and underrepresented minorities (including Black employees) on Ms. Newman's team felt that women and underrepresented minorities were not being promoted in the same way or getting the same opportunities as white men.  Eventually, in 2019, their morale had dipped so low and concerns grew so serious that a taskforce was assembled and a document was prepared that encapsulated some of the items that the employees wanted addressed.

205.    This fifteen-page document, titled "AWS GPP D&I Asks" – referring to Global Public Policy and Diversity and Inclusion – highlighted at the top of the first page a 2016 quote from Jeff Bezos himself: "It's not only that diversity and inclusion are good for our business. It's more fundamental than that – it's simply right."

206.    The employees who contributed to this document, including Ms. Newman, outlined dozens of concrete, highly detailed policy and process changes and ideas that would ensure underrepresented minorities and women are equitably treated at Amazon, including but not limited in connection with consideration for promotion.

207.    This document shares similarities with an email sent to Mr. Bezos and his S-Team personally by Amazon employees representing several wings of the Company in April 2020. The email detailed the employees' distress regarding Mr. Zapolsky's statements about fired warehouse worker Christian Smalls, including that the views expressed rang with racism, as well as the fact that the Company did nothing to address those comments (and retaliatory strategies) and their impact on Black employees and any concerns they created about working at Amazon. To Ms. Newman's knowledge, the Company issued no public response to the employees' email

or took any of even the smallest policy steps recommended by the employees.  Ms. Newman is unaware of any response to the employees' email from Mr. Bezos.

208.     Among the concerns noted in the document was a total lack of female participation on the global leadership team.  As a result, a small group of women, including Ms. Newman, were invited to participate in and present a document at an October 2019 leadership meeting.

209.     Indeed, the first woman to be promoted to Director on the global AWS Public Policy team did not achieve that level until around July 2020, further supporting the general belief that women did not have the same opportunities for promotion.

210.     Although Ms. Newman remained at L6 from January 2017 until her promotion in October 2019, for more than two years her work was on par with L7 work and responsibilities, rather than that of typical L6 employees or her L6 coworkers.

211.     Ms. Newman also had no headcount (employees who reported to and supported her), despite her broad scope of work, until 2020.

212.     Indeed, in or around November 2018, her manager told her that even L5 employees typically managed at least an intern, yet she had not received any management opportunities up to that point.

213.     However, a white male employee received managerial responsibility and oversaw multiple interns before Ms. Newman received headcount.

214.     Ms. Newman was overseeing policy work for a large financial services business unit, whereas others were handling narrower remits.

215.     Her L6 title and compensation were a mismatch for years, with her role more on par with the leadership team's Senior Manager and at times even Director-level employees.

216.     During 2018 and 2019, Ms. Newman had several conversations with management about how her Level did not match her work, and how this also substantially impacted her compensation.

217.     Also in or around November 2018, Mr. Kellogg, in response to Ms. Newman in one of these conversations, had to concede, "Point taken."

218.     After that discussion, Ms. Newman was subjected to micromanagement and hyperscrutiny for a time.

219.     Ms. Newman's managers also passed over her for a broader scope of work, which she was told to expect when she was starting at Amazon.

220.     In her first year on the job and repeatedly after, she was told to expect to work on regulated industries beyond financial services, and in 2018 there was discussion about her doing broader "regulated industries" work, and even taking on a senior role in that area.  The fact that Ms. Newman began working with a colleague to address a matter involving online gaming shows the knowledge of her then-manager, Mr. Kellogg, that she could assume this expanded role.

221.     However, in mid-2019, Mr. Kellogg instead said that he supposedly wanted to bring in someone "more seasoned" or experienced (i.e., up to 20 years of relevant experience) to do that work.

222.     Yet, the person ultimately hired into the role (rather than Ms. Newman) had no cloud-related experience or experience in the healthcare or financial services industries, and was barely three more years out of college than Ms. Newman.  Ms. Newman had been passed over for promotion in favor of a white male when she had been acknowledged as well-suited to the role.

223. This is just one example of Ms. Newman being passed over for a broader scope of work, despite consistent praise for her work product and results, including from Mr. Block and Mr. Kellogg.

224. The Company's discriminatory failure to promote Ms. Newman spanned the years that Mr. Maz harassed Ms. Newman on several occasions, including his sexual assault of Ms. Newman in early 2018.

225. Even Ms. Newman's eventual October 2019 promotion did not remedy her original de-leveling to L6 when she was hired, since she had lost three years at a more senior, higher-compensated level and is in lockstep with people who joined Amazon with lesser experience and were doing less-advanced work for years.

226. Although Ms. Newman finally received a job title that she had been seeking for at least a year based upon her responsibilities, another white L6 employee received such a title nearly immediately after joining the Company.

227. Missing out on a single level can quickly lead to hundreds of thousands of dollars, and ultimately millions, of dollars in lost compensation, as the difference between annual equity paid out to a L6 versus a L7 employee can easily be $150,000 to $200,000 or more, with the difference at time of hiring even higher than that (and, of course, the value of each unit of that equity continues to grow with the Company's stock price as well).

228. Again, Ms. Newman has had many conversations with other Black and/or Latinx Amazon employees who have told her that they, too, felt they had been shortchanged on their Level at the Company when they joined or through delayed promotions later, including employees who joined with very impressive prior experience.

229.    On several occasions, Ms. Newman noted promotions made by the Company to levels equal or higher to her own for individuals with comparable or lesser tenure and experience.

230.    Ms. Newman, along with other Black employees, therefore is being damaged by a baked-in disparity in pay (particularly in terms of equity) and seniority from which she likely can never catch up.

231.    Although Ms. Newman did not mention them in her June 2020 written complaint or her later communications with the Company's investigators, as she has no desire to cause negative consequences for herself or her coworkers, she feels that management's apparent disregard for equity and diversity also is reflected in instances of racial insensitivity among rank-and-file employees.

232.    For example, at one team event, a white colleague suddenly declared that, "I think it would be really fun if Charlotte took a picture with the 'Jambalaya' wine bottle."

233.    When Ms. Newman asked the coworker why it would be funny if she specifically did this, she claimed it was because of what Ms. Newman was wearing (unlikely, as she was wearing a white shirt and black pants).

234.    It was clear to those present that the coworker regrettably had connected her Black colleague with the Southern or Louisiana reference on the bottle—a different coworker texted Ms. Newman the next day that the comment was "inappropriate" and awkward and that she shared her shock and offense.

235.    On another occasion in or around November 2019, while shopping with a coworker on a business trip, Ms. Newman's colleague told her, "Oh my god, you look like a gorilla" when she was trying on a black jacket.

236.    When Ms. Newman raised the historical stereotypes embedded in this comment, and the colleague later apologized for her words.

237.    Ms. Newman's work environment in Public Policy unfortunately regularly presented such racially offensive and stereotyping conduct (including by her managers in their comments labeling her "scary" and similar terms, and Maz's mocking of her hair as a Black woman).

238.    Ms. Newman also spoke with Mr. Kellogg on multiple occasions about the racially problematic and offensive conduct and comments of his Executive Assistant, a Latinx woman, who made a habit of using racially charged or stereotyping language and comments.

239.    Regrettably, even certain coworkers who no doubt would count themselves as allies of Black Americans in the cause of social justice clearly have far to go in terms of racial sensitivity and self-examination regarding their own prejudices.

240.    Amazon likely would benefit from implementing additional and/or updated diversity and inclusion training among its workforce.

241.    In addition, Amazon's discriminatory treatment of Ms. Newman and other Black employees is evidenced not only in its inequitable hiring and promotion practices, but through its failure to prioritize and remedy a dearth of Black representation, particularly in its top corporate ranks.

242.    At the Company's higher levels of leadership, across Amazon's Officers and Directors, as well as AWS's own top executive leadership, there is only one Black board member, and the rest of the executives do not include any Black executives.

243.    Amazon's Officers and Directors page (https://ir.aboutamazon.com/officers-and-directors/default.aspx) puts this on display:

## Officers



Jeffrey P. Bezos | Amazon President, Chief Executive Officer, Chairman of the Board



Brian T. Olsavsky | Amazon Senior Vice President, Chief Financial Officer



Andrew R. Jassy | Amazon Chief Executive Officer – Amazon Web Services



Shelley L. Reynolds | Amazon Vice President – Worldwide Controller



Jeffrey A. Wilke | Amazon Chief Executive Officer – Worldwide Consumer



David A. Zapolsky | Amazon Senior Vice President, General Counsel and Secretary

## Directors



Jeffrey P. Bezos | Amazon President, Chief Executive Officer, Chairman of the Board



Keither B. Alexander | Amazon Director



Rosalind G. Brewer | Amazon Director



Jamie S. Gorelick | Amazon Director



Daniel P. Huttenlocher | Amazon Director



Judith A. McGrath | Amazon Director



Indra K. Nooyi | Amazon Director



Jonathan J. Rubinstein | Amazon Director





Thomas O. Ryder | Amazon Director

Patricia Q. Stonesifer | Amazon Director

Wendell P. Weeks | Amazon Director

244.    This picture is essentially duplicated among AWS's top leadership

(https://craft.co/amazon-web-services/executives), which includes its CEO:

**Amazon Web Services CEO and Executive Team**






Andrew R. Jassy | AWS Chief Executive Officer

Raju Gulabani | AWS Vice President, Databases, Analytics & Machine Learning

Eugene Kawamoto | AWS Director of Product Management

Stephen Schmidt | AWS Chief Information Security Officer






Carol Potts | AWS Head of ISV Sales – Americas

Sandy Carter | AWS Vice President

Jens Gruenkemeier | AWS Vice President, Supply Chain & Procurement

Jeff Barr | AWS Vice President & Chief Evangelist






Ian Wilson | AWS Vice President, Human Resources

Brian Hall | AWS Vice President, Product Marketing

Peter Hill | AWS Vice President, Productivity Applications

Frank Fallon | AWS Vice President, Financial Services

245.     Naturally, a lack of diversity in an organization's highest ranks and upper management has a direct impact on diversity in promotions, as the senior executives and managers are the ones who make recommendations for promotions and compensation decisions.

246.     The relative lack of Black employees at the Company's higher levels demonstrates a sustained failure to engage, as Amazon has pledged to do, in "standing in solidarity" with its Black employees.

247.     As described herein, the Company's evident lack of commitment to recruiting and advancing Black employees strongly corresponds with how its management has treated Ms. Newman.

248.     Amazon's Diversity & Inclusion landing page contains the statement that: "Amazon has always been, and always will be, committed to diversity and inclusion.  We seek builders from all backgrounds to join our teams, and we encourage our employees to bring their authentic, original, and best selves to work."[18]

249.     For many at Amazon, that may be true.

250.     However, the actions of the Company and its leaders often do not live up to that aspiration, and Ms. Newman's experiences are not the only recent illustration of this fact.

251.     On November 12, 2020, Christian Smalls, who formerly worked at Amazon's Staten Island facility, filed an action for race discrimination and retaliation in the U.S. District Court for the Eastern District of New York, alleging that the Company failed to provide its largely Black and Latinx employees with personal protective equipment and other safety measures, as compared to the more senior white management employees.[19]

---

[18] See https://www.amazon.jobs/en/landing_pages/diversity-and-inclusion (last visited December 11, 2020).
[19] See https://www.law360.com/retail/articles/1328448/amazon-s-virus-response-allegedly-harmed-minority-workers?copied=1 (last visited December 11, 2020).

252.    Mr. Smalls was fired in March 2020 after leading efforts to organize warehouse workers and protests at the facility, purportedly for violations of COVID-related protocols.

253.    Regrettably, when discussing Mr. Smalls, who is Black, and his activities in a meeting with senior Amazon leaders earlier this year, Amazon's General Counsel David Zapolsky said, "He's not smart, or articulate, and to the extent the press wants to focus on us versus him, we will be in a much stronger PR position than simply explaining for the umpteenth time how we're trying to protect workers."

254.    Amazon therefore planned to make Mr. Smalls "the face of the entire union/organizing movement" in a PR strategy to discredit the movement and protests by attacking him and portraying his actions in as negative a light as possible: "Make him the most interesting part of the story, and if possible make him the face of the entire union/organizing movement."[20]

255.    Apparently, there was "general agreement" on this point among the members of Amazon's leadership at the meeting, which included Senior Vice President ("SVP") of Worldwide Operations and Customer Service Dave Clark and SVP of HR Beth Galetti.

256.    Understandably, these comments by Mr. Zapolsky have been downplayed by him as driven by emotion and indignation at Mr. Smalls's actions in not adhering to self-quarantine instructions.

257.    However, the strategy of negatively portraying and/or smearing an employee who has engaged in legally protected activity to obtain better treatment of himself and his colleagues is all too common in such situations, including where discrimination, retaliation, or other unlawful actions are reported by employees.

---

[20] See https://www.vice.com/en/article/5dm8bx/leaked-amazon-memo-details-plan-to-smear-fired-warehouse-organizer-hes-not-smart-or-articulate (last visited December 11, 2020).

258.    On or around June 3, 2020, Mr. Zapolsky sent an email to the employees in Amazon's legal division, with the subject line "Black Lives Matter," expressing his sympathy regarding the horrible, malicious killings and mistreatment of Black Americans by police and others.

259.    Interestingly, Mr. Zapolsky also said in the message that (emphasis added):

> "One striking theme that many of these organizations [to which Amazon had recently donated] share is that **they seek to achieve change by asserting and enforcing rights through the legal system** — **a longstanding and powerful tradition of the civil rights movement in this country**. …
>
> Finally, I also wanted to make sure you saw Jeff's Instagram post from Friday, which amplified an article about **how many of our Black colleagues are feeling right now**. This is an extraordinarily difficult time. **We all need to give each other support and space as we move through this period, particularly managers. And we will**.
>
> If there is anything that I, personally, or any member of our legal leadership team can do to help in any way — even if you just want to talk, ask any question, share ideas or feedback, or just vent — please feel free to reach out [to] me, or any member of the legal leadership team, directly. My personal mobile and other contact information is in the phone tool."[21]

260.    Mr. Zapolsky's promises in this message went unfulfilled in connection with how Ms. Newman's complaint was handled by the Company. Not only would the Company fail to adequately communicate with Ms. Newman about the status of the investigation of her complaint, but it failed utterly to offer any further support, even when she made modest requests of the Company.

261.    In addition, Mr. Zapolsky failed completely to reckon with his previous outrageous and racially discriminatory and retaliatory remarks and plans regarding Mr. Smalls

---

[21] Id.

and his coworkers on Staten Island, the majority of whom are Black and/or persons of color (and his dismissal of their legitimate equity and safety concerns).

262.    Indeed, some Amazon legal staff took exception to Mr. Zapolsky's email and strongly questioned its sincerity or impact, including because neither Mr. Zapolsky nor the Company had issued any internal communication about his earlier inappropriate comments regarding Mr. Smalls.

263.    One employee was quoted as saying: "This is the first time we've heard comments from legal leadership on these issues after David's leaked email, which was not address[ed] or acknowledged in any way by David or other legal VPs … It's hard to see this as genuine when he has not addressed his offensive and arguably racist comments from the leaked memo."[22]

## IV.    MS. NEWMAN FILES A LEGALLY PROTECTED COMPLAINT REGARDING HARASSMENT AND DISCRIMINATION

264.    Ms. Newman had found relatively few resources, considering Amazon's literally unparalleled size and sophistication, to guide her regarding what an employee should do if she has been sexually harassed, particularly as far as what a person's rights are, how things would proceed, and what to do if one fears retaliation by managers for making a complaint.

265.    However, Ms. Newman also recognized that she could not continue working indefinitely with Mr. Maz, who, through at least April 2020, was still assigning her work.

266.    Once the Company closed its corporate offices and employees such as Ms. Newman were required to begin working remotely, she saw an opportunity to raise her concerns

---

[22] https://www.vox.com/recode/2020/6/3/21279473/amazon-david-zapolsky-email-black-lives-matter-christian-smalls-covid-19 (last visited December 11, 2020).

from a position of relative safety—although she continued to have contact with him on email, conference calls, and video calls.

267.    So, on or around May 12, 2020, Ms. Newman emailed a representative of HR to get more information about the process of filing a sexual harassment complaint.  Amazon's inadequate, mostly boilerplate anti-discrimination policies did not provide Ms. Newman with the information she needed to proceed with a complaint of harassment and discrimination.  This was particularly the case given her well-founded fear of retaliation by at least senior male managers about whom she would be reporting unlawful harassment and discriminatory conduct.

268.    Ms. Newman had taken note of Amazon's relative lack of action on the diversity and inclusion proposals that Public Policy employees had made in 2019, as well as the Company's swift retaliation against Black warehouse workers like Christian Smalls and Donald Archie who had opposed discriminatory conditions in their Amazon workplaces.  She also had seen the token messages of support posted by the Company and Mr. Bezos, but knew that if she was going to file a complaint, it would be thorough and detailed, and contain as many objectively verifiable facts as possible.

269.    On or around June 19, 2020, Ms. Newman emailed HR Director Jim Sterner and copied Lauren Thomas to formally file a written complaint regarding Mr. Maz's sexual harassment and other discriminatory treatment, including by Mr. Block.

270.    Although Ms. Newman received a reply email that same day from Mr. Sterner, she was not contacted to set up a meeting until four days later, and then only after she sent a reminder email.

271.    On July 15, 2020, outside attorney and investigator Angela Vogel of the law firm Davis Wright Tremaine interviewed Ms. Newman for approximately three hours.  Ms. Newman's request to record the interview was denied.

272.    Ms. Newman also provided Ms. Vogel with various supplemental information and documents via email, and identified various witnesses who could provide relevant and corroborating information.

273.    Amazon's investigation eventually found that Mr. Block had made stereotypical comments, and yet beyond receiving some training he kept his position and suffered no consequences.  The Legal department also did not talk with Ms. Newman about what could be done to improve the workplace and its policies towards women and underrepresented minorities.

274.    On July 20, 2020, Ms. Newman asked Julia Thorner in Litigation that the Company do what it could to ensure that she no longer had to have contact with Mr. Maz.

275.    After a token email response two days later to look into it, Ms. Newman did not hear anything at all from the Company about what it would do to shield Ms. Newman from contract with Mr. Maz, or even regarding about the status of the investigation of her complaint. The Company made no effort to shield Ms. Newman or prevent further contact, even via email, telephone or video conference, with Mr. Maz.

276.    As a result, Ms. Newman was forced to continue to encounter Mr. Maz on various calls, and take her own measures to avoid contact with him to the extent possible.

277.    Ms. Newman had to email again on September 10, 2020, nearly two months later, to let the Company know that she had to resort to taking her own steps to try to avoid contact with Mr. Maz, and still had no word on what, if anything, had occurred in the investigation.

278.    Ms. Newman filed a complaint with the Washington, DC Office of Human Rights (OHR) in September 2020 in order to document and preserve her claims under applicable law, including the DC Human Rights Act ("DCHRA").  Before filing this complaint, Ms. Newman informed OHR that she was withdrawing her complaint and would be filing her DCHRA claims in court.

279.    Ms. Newman learned on or around October 2, 2020 that Mr. Maz had been terminated.

280.    Ms. Newman was not informed and is not aware of who the decision-makers were regarding the termination, or whether her complaint or Mr. Maz's termination were discussed among senior Amazon officials.

281.    Ms. Newman was told that Mr. Block would be required to undergo coaching and training because the Company substantiated that he had made comments which invoked gender and racial stereotypes.

282.    Mr. Block was not terminated, nor is Ms. Newman aware of any other measures taken by the Company regarding Mr. Block and his discriminatory conduct.  Ms. Newman is not aware of the Company requiring Mr. Block to undergo any training or undertaking an investigation of his conduct towards Ms. Newman and other employees. Indeed, it appears as though Mr. Block instead has been rewarded, as he has moved to a coveted role on a revenue-generating team. He also brought an AWS employee, Jarrett Lane, over to his new team, who women on the Public Policy team had previously made complaints about.  Based upon this action, it does not appear Mr. Block has learned from or left behind his past discriminatory behavior.

283.    Ms. Newman asked whether the investigation of Mr. Block's comments also probed whether his comments were reflective of a broader lack of objectivity in his management of her, which contributed to, among other things, lower performance ratings and continued under-leveling.

284.    Ms. Thorner had no response initially, but later informed Ms. Newman that the secondary investigation of Mr. Block would continue.

285.    It is Ms. Newman's understanding that an investigation was conducted to look into her report of discriminatory conduct by Mr. Block, including regarding whether bias may have affected her early performance evaluations and leveling decisions.

286.    However, it is unclear whether this investigation addressed the issue of how the insensitive attitudes and perceptions of her managers regarding her circumstances and characteristics as a Black woman affected her initial level, compensation, and promotion prospects at AWS.  It also is unclear whether Amazon investigated the full range of comments and conduct reported by Ms. Newman, particularly as there was no further follow-up with her in connection with that purported investigation.

287.    This is in keeping with the reported experiences of other Amazon and AWS employees, who say that the Company's responses to complaints will be much more tepid when there are no third witnesses to offensive comments and conduct reported by employees, and that Company investigations will selectively address only portions of a Black employee's complaints.

288.    Due to fears of retaliation and impact on her reputation and prospects due to having made a complaint of harassment and discrimination, Ms. Newman sought a position within Amazon that was outside the coverage of Mr. Block, Mr. Kellogg, and others in that

Public Policy area.  Ms. Newman received no assistance from HR or other Amazon personnel in that endeavor, nor was any offered.

289.    As of November 2, 2020, Ms. Newman is on the AWS Startups team, with a new manager.  Her current title is Head of Underrepresented Founder Startup Business Development.

290.    However, she is still at a lower level than she otherwise could have been, and at a lower compensation rate, which will continue to cause lost, discriminatorily lower compensation at least until she is elevated to L8 (Director).

291.    Ms. Newman also was told by Amazon that it would not consider providing her with any monetary payment to compensate for past shortfalls in her compensation due to alleged discriminatory animus or unlawful unequal employment practices.

292.    Ms. Newman sought the change in teams to get out of a bad situation, and she achieved that switch on her own without any assistance in connection with her complaint.

293.    Ms. Newman finally made the decision to retain legal counsel because she wanted to ensure that her legal rights were protected, that she could obtain all legal redress to which she is entitled, and also to engage the Company in a dialogue regarding redressing its management shortcomings and discriminatory misconduct from a greater position of parity.

294.    During this dialogue, Ms. Newman and the Defendants (with the exception of Defendant Maz) entered into agreements that tolled the running of the statute of limitations on Ms. Newman's legal claims from December 21, 2020 through February 24, 2021, a period of more than two months.

## FIRST CAUSE OF ACTION
**(Hostile Work Environment, Sexual Harassment and Race, Color, and/or Sex/Gender Discrimination under Title VII of the Civil Rights Act of 1964)**
***Against Amazon.com, Inc. and Amazon Web Services, Inc.***

295.    Plaintiff hereby repeats, reiterates, and realleges each and every allegation in the preceding paragraphs as if set forth fully within.

296.    Defendants Amazon.com, Inc. and Amazon Web Services, Inc. have discriminated against Plaintiff on the basis of her race and/or color and sex/gender (female/woman) in violation of Title VII by subjecting her to disparate treatment of employment available to non-Black/African-American, and non-Black or Brown and male employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her coworkers who do not belong to the same protected categories, as well as, but not limited to, by paying her less than her comparable and/or similarly situated colleagues in sufficiently similar and/or equivalent positions, failing to hire and/or promote her to an appropriate job level, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

297.    These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended.

298.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

299.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

300.    Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Discrimination and Harassment in Violation of Section 1981)**
***Against All Defendants***

301.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

302.    Defendants have discriminated against Plaintiff on the "but-for" basis and because of her race (Black/African-American) and/or color (Black/Brown) in violation of Section 1981 by denying her the same terms and conditions of employment available to non-Black/African-American, and non-Black or Brown employees (which would not have occurred if not for Plaintiff's Black and/or non-white race and/or color), including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her coworkers who do not belong to the same protected categories, as well as, but not limited to, by paying her less than her comparable and/or similarly situated colleagues in sufficiently similar and/or equivalent positions, failing to hire and/or promote her to an appropriate job level, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

303.    Defendants have discriminated against Plaintiff on the basis of her race and/or color in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination due to and directed at her race and/or color.

304. As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of damages.

305. As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

306. Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Violations of the Equal Pay Act)**
***Against Amazon.com, Inc. and Amazon Web Services, Inc.***

307. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

308. During Plaintiff's employment, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort and responsibility under similar working conditions, and paid Plaintiff a rate of pay, including but not limited to salary and securities awards or grants, less than such male employees.

309. Defendants engaged in patterns, practices, and/or policies of employment which discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay,

including but not limited to salary and securities awards or grants, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions.

310.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the Equal Pay Act ("EPA"), Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

311.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the EPA for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Discrimination in Violation of DCHRA)**
*Against All Defendants*

312.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

313.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her race (Black/African-American), color (Black/Brown), and gender (female/woman), in violation of the DCHRA by denying Plaintiff the same terms and conditions of employment available to employees who were not in these protected classes, including, but not limited to, by paying her less than her comparable and/or similarly situated colleagues in sufficiently similar and/or equivalent positions, failing to hire and/or promote her to an appropriate job level, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

314.    Defendants have further discriminated against Plaintiff in violation of the DCHRA by engaging in racial and sexual harassment and/or creating, fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment.

315.    As a direct and proximate result of the unlawful discriminatory conduct committed by Defendants in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, including, but not limited to, loss of past and future income, for which she is entitled an award of monetary damages and other relief.

316.    As a direct and proximate result of the unlawful conduct committed by Defendants in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

317.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the DCHRA, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the DCHRA)**
***Against Defendants Maz, Block, and Kellogg***

318.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

319.    Defendants Maz, Block, and Kellogg knowingly and maliciously aided and abetted the unlawful employment practices, discrimination, harassment, and retaliation against Plaintiff in violation of the DCHRA.

320.    As a direct and proximate result of the unlawful conduct of Defendants Maz, Block, and Kellogg in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including but not limited to loss of past and future income, for which she is entitled to an award of damages.

321.    As a direct and proximate result of the unlawful conduct of Defendants Maz, Block, and Kellogg in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, as well as physical injury, for which she is entitled to an award of damages.

322.    The unlawful actions of Defendants Maz, Block, and Kellogg were done with willful negligence, or recklessness, or a wanton or conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the DCHRA, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Bias-Related Crimes/Intentional Acts Pursuant to**
**Washington, DC Code Chapter 37, §§22-3701, *et seq.*)**
***Against Defendant Maz***

323.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

324.    The above-described conduct of Defendant Maz, including, but not limited to, Maz's intentional assaults upon and sexual abuse of Plaintiff, constitute "bias-related crimes" and/or "designated acts" against Plaintiff, as defined by the Washington, DC Bias Related Crime act, D.C. Code Ch. 37, §§22-3701, et seq. (including §22-3704) (2019), ("DCBRCA").

325.    Maz committed a "bias-related" against Plaintiff because she is a woman and/or a Black woman, at least in part, because he has an animus towards women and/or Black persons. Maz's bias-related animus is demonstrated by, among other things, his violent and aggressive treatment of Ms. Newman in a manner offensive towards women with regard to his sexual harassment and assault, as well as towards Black women in particular in connection with his comments and actions against Ms. Newman (including but not limited to his comments about and pulling of her hair).

326.    As a direct and proximate result of Maz's unlawful bias-motivated acts, Plaintiff

has sustained in the past and will continue to sustain, monetary damages, physical injury, pain

and suffering, and serious psychological and emotional distress, entitling her to an award of

compensatory damages.

327.    Maz's unlawful bias-related acts against Plaintiff entitle her to punitive damages

and an award of attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**(Assault and Battery / Sexual Abuse)**
***Against Defendant Maz***

328.    Plaintiff repeats and realleges by reference each and every allegation in the

preceding paragraphs, as though fully set forth herein.

329.    When Defendant Maz assaulted and battered Plaintiff on multiple occasions,

including acts that were sexual in nature and which constituted sexual abuse, Maz intended each

time to cause Plaintiff apprehension of an imminent harmful and offensive contact with her

person.

330.    As a result of Maz's acts, Plaintiff was in fact placed in great apprehension of

imminent harmful and offensive contact with her person.

331.    At no time did Plaintiff consent to any of the acts by Maz alleged above.

332.    Maz's conduct as described above caused Plaintiff to be apprehensive that Maz

would subject her to further intentional invasions of her right to be free from offensive and

harmful contact, including sexual abuse, and demonstrated that at all times material herein, Maz

had a present ability to subject her to an intentional offensive and harmful touching.

333.    As a direct and proximate result of Maz's unlawful conduct and sexual abuse as alleged above, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, and economic harm.

334.    The aforementioned conduct by Maz was willful, wanton, and malicious and entitles Plaintiff to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the District of Columbia;

B.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.    An award of liquidated damages equal to the amount of Plaintiff's past and future lost wages;

E.    An award of punitive damages in an amount to be determined at trial;

F.    Prejudgment interest on all amounts due;

G.    Post-judgment interest as may be allowed by law;

H.    An award of Plaintiff's reasonable attorneys' fees and costs; and

I.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 26, 2021
       New York, New York

       Respectfully submitted,

       **WIGDOR LLP**

       By: _____
          Douglas H. Wigdor
          (D.C. Bar No. 447370)
          Lawrence M. Pearson
          (admitted *pro hac vice*)

       85 Fifth Avenue
       New York, NY 10003
       Telephone: (212) 257-6800
       Facsimile: (212) 257-6845
       dwigdor@wigdorlaw.com
       lpearson@wigdorlaw.com

       *Counsel for Plaintiff*